KANSAS, OKLAHOMA & GULF RAILWAY COMPANY, a corporation, Plaintiff in Error,

v.

Earl LeRoy PAINTER, Defendant in Error.

No. 37807.

Supreme Court of Oklahoma.

Nov. 5, 1958.

Rehearing Denied Dec. 9, 1958.

Application for Leave to File Second Petition for Rehearing Denied Jan. 6, 1959.

Looney, Watts, Looney & Nichols, Oklahoma City, James D. Gibson, Muskogee, Steele & Boatman, Okmulgee, for plaintiff in error.

Foliart, Hunt & Shepherd, Oklahoma City, Charles W. Gregory, Oklahoma City, for defendant in error.

HALLEY, Justice.

This action for damages for personal injuries was filed in the Superior Court of Okmulgee County, Oklahoma, by Earl LeRoy Painter against the Kansas, Oklahoma & Gulf Railway Company, a corporation, and judgment for plaintiff, based upon a jury verdict, was rendered for the sum of $35,509.22. The parties will be referred to as plaintiff and defendant as they appeared in the trial court.

The injuries complained of by the plaintiff were the result of a collision of a 2½ ton truck driven by plaintiff in an easterly direction on Highway 266 just west of the town of Dewar and east of Henryetta, where the highway crosses the branch or switchline of defendant, running north and south and about 1½ blocks north of defendant's main line. Defendant's engine was backing toward the south and pulling a caboose at an admitted speed of 8 to 10 miles per hour when plaintiff's truck, moving east on the highway, struck the defendant's engine 60 feet from the front part of the engine that had already passed over the crossing of the highway.

Plaintiff admitted that he was driving 35 miles per hour when he first saw the train some 50 or 60 feet ahead of him when he put on his brakes, but could not avoid striking the engine with such force as to derail three sets of drivers and the front wheels of the caboose. Plaintiff's truck caught fire and he was severely burned and bruised.

The accident occurred at about 5 a. m., August 14, 1952. On that morning plaintiff left Guthrie soon after midnight, driving a new 2½ ton Ford truck tractor, pulling a 2½ ton trailer loaded with vetch and alfalfa seed, bound for Little Rock, Arkansas. He was followed by another truck of the same employer and similarly loaded. They

stopped at Okemah where both drivers and a girl friend of plaintiff ate breakfast together, and the other driver preceded plaintiff after they had stopped at Henryetta.

Plaintiff testified that the highway jogged to the right before reaching the railroad crossing. He also testified that it was dark and that his lights picked up the train moving across the road when he got by the railroad crossing sign around the curve in the road. Actual measurements showed that the crossing sign was 248 feet west of the crossing.

The locomotive then moving across the highway was 69 feet long and over 16 feet high. The engine was struck with such force that the blow derailed part of its drivers and the caboose wheels, and also sprung or twisted the rails of the railroad in the highway pavement.

The slow movement of the train was no doubt due to the fact that the branch track of the railroad joined the main line a block and a half south of the crossing where a switch had to be thrown to reach the main line. This branch of the railroad ran about 8 miles to the north to a junction with the Okmulgee Northern and was used to switch cars from one main line to the other.

It was not disputed that defendant's engine had a headlight or backup light of equal power of the headlight, being a 250 watt light which would light up the right of way 1,000 feet ahead of the train as it backed to the south. The train crew all testified that this light was burning when the accident happened at the crossing and immediately prior thereto. They also testified that the engine bell had been ringing since a half mile north of the crossing and continued constantly and was ringing as they approached and crossed the highway; that the engine whistle was blown for this and two crossings north of this one, covering about one-half mile.

Four residents of the area near the crossing testified that the engine whistle was sounded as the engine approached the crossing and up to the time of the collision, some 374 feet to the south of the first crossing to the north. One of plaintiff's witnesses who lived at the first house south and west of the crossing testified that he heard the bell of the engine before he heard the crash, and one who lived north and west heard the long and short blast of the whistle before the collision.

Plaintiff testified that because traffic was light he drove with his lights "down", at 35 or 40 miles per hour, even after he saw the sign that a railroad crossing was ahead. The speed of the truck being about 3½ times the speed of the train, explains why the engine men who saw the lights of plaintiff's truck some 250 or 350 feet west of the crossing did not think there would be any collision.

Plaintiff alleged the various elements of negligence on the part of defendant, including failure to sound whistle or bell, excessive speed, allowing obstructions to view of crossing to exist, failure to provide flagman, gates or automatic bell at crossing, failure to provide signal lights, and failure to install lights to make engine visible to highway travelers.

We have examined the exhibits of the plaintiff which show that the curve in the highway is so slight that plaintiff could have seen the highway crossing in ample time to bring his truck to a stop prior to reaching the railroad crossing had he used ordinary care in driving after he saw the crossing sign west of the crossing.

The defendant submits as its first proposition as follows:

"The trial court erred in submitting this case to the jury because there is no evidence of any negligence of the defendant, whose train had crossed a public highway in ample time ahead of plaintiff for him to stop, and was still backing through the crossing when struck by plaintiff."

Our attention is called to the court's instruction No. 6, the first portion of which is approved by defendant. It instructs the jury as follows:

"You are instructed that the presence of a train or railroad cars on a public

crossing is sufficient notice to the driver of the automobile on the highway of such obstruction, and the defendant railroad was under no duty to provide any other notice or signals of the presence of the train,"

However, the court added to the above instruction that:

"unless you further find that at the time and place of the accident there existed such unusual circumstances requiring additional precautions on the part of the railroad."

The last quoted part of instruction No. 6 qualifies the first quoted portion of that instruction only where unusual circumstances exist, and defendant contends that no such unusual circumstances existed at the crossing where this accident occurred. The circumstances relied upon by the plaintiff here were that it was dark, a curve in the highway and an obstruction of view 173 feet west of the crossing and on the north side of the highway.

In Kurn v. Jones, 187 Okl. 94, 101 P.2d 242, 244, recovery was denied plaintiff where his evidence showed that he had driven into a railroad car which he could not see because of darkness, although he knew the crossing was just in front of him. In the case before us the plaintiff admitted seeing the sign that a railroad crossing was in front of him. In the body of the opinion the Court said:

"* * * Plaintiff had no legal right to presume that the track was clear. The very knowledge of the presence of a railroad track is sufficient notice that a train may be blocking the crossing, and under the law the motorist must drive in such a manner that he may be able to stop short of a collision with a railroad car that may be standing on the track. But instead of making certain that the track was clear the plaintiff in this case drove slowly but blindly across and into the freight car. The trainmen in such case are not required to take extra precaution to warn the motorist; they are not required to anticipate or foresee that a motorist will disregard the duties the law places upon him. By the plaintiff's own evidence it is shown that he drove blindly into an obstruction which was legally upon the highway.

\* \* \* \* \* \*

"* * * Here the defendant was acting in accordance with its rights, and plaintiff knew the track was there. He had no legal right to assume that the track was clear. He was required to drive in such a manner as to avoid collision with any freight car that might happen to be there. The trainmen were not required to anticipate that he would do otherwise. Without this element there was no proof of primary negligence sufficient to go to the jury. * *"

In Holt v. Thompson, 10 Cir., 115 F.2d 1013, 1016, an Oklahoma case, it was said:

"The railroad company had the legal right to block the crossing in order to permit the passage of its cars over the intersection. The plaintiff had no legal right to presume that the track was clear. The very knowledge of the railroad track is sufficient notice that the train may be blocking the crossing and under the law the motorist must drive in such a manner that he may be able to stop short of a collision with a railroad car that might be standing on the track."

The same rule was announced in Jones v. Atchison, T. & S. F. Ry. Co., 129 Kan. 314, 282 P. 593, where a motorist ran his truck into a train standing across a highway on a dark and foggy night. The rule is general that a motorist "must drive in such a manner that he may be able to stop short of a collision" which is equivalent to the well established rule that a motorist must drive at such speed as will enable him to stop within the clear distance ahead.

We have examined the plaintiff's exhibits and find that No. 6 was taken 919 feet west of the crossing and shows that the road is practically straight, and that from that distance to the west, it is clear that the railroad crossing is clearly visible, with no obstruction from the alleged jog. Other pictures

taken from the west side of the crossing also show that the jog or slight curve in the highway west of the crossing is not sufficient to obscure the crossing up to 50 or 60 feet of the railroad crossing. Actual measurements show that the curve starts 524 feet west of the crossing and ends 198.2 feet west of the track. This fact shows that if plaintiff had been looking ahead he could have seen the train from such distance from the crossing and that he could easily have stopped the truck before running into it with such force as to derail some of it and bend the rails of the track.

Plaintiff undertook to prove that the view of the railroad track and train was obstructed by trees, shrubs and houses to the north of the crossing. He claims that the train was on the crossing before or at the time he first saw it. He admits that he saw the railroad crossing sign. He testified as follows:

"Q. Did you ever see the train before the wreck happened? A. Yes, sir.

"Q. Where was the train, what was it doing when you first saw it? A. Well, I just—as I made that rise and I looked—I was just a few feet when I looked up and seen the lights of the train coming across, caught my light— I was just a few feet from it. I just went ahead and slammed my brakes down, pulled my trailer brakes and set my tractor brakes down.

\* \* \* \* \* \*

"Q. Where was it in relation to the highway, where was the train? A. It was right across the highway, coming across the highway.

\* \* \* \* \* \*

"Q. \* \* \* where was the railroad engine when you first heard the sound of the whistle? A. It was going across the road when my lights picked it up on the back part of the engine.

\* \* \* \* \* \*

"Q. And about how far back were you from the train when you first saw it come out on the highway? A. I'd say about fifty—sixty feet.

\* \* \* \* \* \*

"Q. You told Counsel on direct examination that some fifty or sixty feet back from that crossing this train came within your lights, is that right? A. Yes, sir.

"Q. Now what part of the train did you see at that time, do you know? A. You mean at the time at about fifty or sixty feet back?

"Q. Yes, when you first saw it? A. Well, I'm not acquainted too much with engines, but it was the back part of the engine. I don't know what you would call it but—"

Plaintiff further testified in regard to when he first heard the whistle of the train:

"Q. Did the train ever sound a whistle? A. Not until just before I got right up on the train is when I heard one whistle.

"Q. Had you seen the train before or did you hear the whistle before you saw it? A. No, sir, no, sir.

"Q. I beg your pardon? A. No, sir.

"Q. Did you— A. Not until I was right at the distance to where—fifty or sixty feet back I heard the whistle is the time that I slammed onto my brakes. I heard the whistle then and seen the train as it come across my headlights."

Plaintiff did not deny that he struck defendant's engine 60 feet from the front end as it was backing toward the south, and as has been said, his truck was moving at 35 miles per hour as it approached the crossing. He does not dispute the fact that the train was moving 8 to 10 miles per hour.

As to obstruction of his view to the north, from which the train was approaching, the actual measurements show that the last tree north of the track was 173 feet west of the railway track, and plaintiff could have seen the approaching train in time to stop prior to the collision.

We find that there were no "unusual circumstances" existing at the railroad crossing that would require the defendant to pro-

vide any other notice or warning that its train was on the crossing when the collision occurred.

The judgment of the trial court is reversed with directions to sustain the demurrer and motion of the defendant for a directed verdict and render judgment for the defendant.

DAVISON, JOHNSON, WILLIAMS, JACKSON and CARLILE, JJ., concur.

WELCH, C. J., concurs in conclusion.